In the Matter of: H. J. Cohn Furniture (No. 2) Co., Bankrupt.

H. J. COHN FURNITURE (NO. 2) CO., Appellant,

v.

TEXAS WESTERN FINANCIAL CORPORATION, et al., Appellees.

No. 76–3019
Summary Calendar.*

United States Court of Appeals, Fifth Circuit.

Jan. 3, 1977.

6. See note 4, *supra.*

* Rule 18, 5 Cir., see *Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al.,* 5 Cir., 1970, 431 F.2d 409, Part I.

Perry J. Radoff, Houston, Tex., for appellant.

Robert B. Wallis, Houston, Tex., for Walter E. Heller & Co.

Hugh M. Ray, Houston, Tex., for Citizens & Southern Nat'l. Bank.

W. Edwin Denman, Thomas T. Hutcheson, Houston, Tex., for Cromfac, Inc., et al.

Before COLEMAN, GOLDBERG and GEE, Circuit Judges.

GOLDBERG, Circuit Judge:

This case raises the question whether a Texas corporation's written guaranty of a debt owed by a second corporation is a "stock or bond" of the guarantor for purposes of article XII, § 6 of the Texas Constitution. Article XII, § 6 provides:

> No corporation shall issue stock or bonds except for money paid, labor done, or property actually received, and all fictitious increase of stock or indebtedness shall be void.

We hold that in the circumstances of this case a corporate guaranty is not a "stock or bond." Accordingly, the guaranties are not rendered unenforceable against the guarantor merely by virtue of the latter's failure to receive money, property, or labor in return for entering its obligation.

## I. Facts

In 1972 Harold J. Cohn, principal stockholder and president of the debtor, H. J. Cohn Furniture Co., executed certain guaranties on behalf of the debtor for debts of Alamo Carpet Showroom, Inc., Surplus Carpet Sales, Inc., and Signal Carpet, Inc., owed to the appellees. The guaranties were apparently executed to ensure that these corporations would continue to supply the debtor with trade items it needed.[1] The debtor subsequently filed a petition under

---

1. It is worth noting that Harold Cohn owned 100 per cent of the stock of Alamo. The extent of his holding in the other corporations whose debts Cohn Furniture guaranteed is not clear

Chapter XI of the Bankruptcy Act. It now contests those guaranties as invalid under the Texas Constitution.

Cohn Furniture did not raise as a defense to the appellees' claims in Bankruptcy Court either that Harold Cohn's executing the guaranties was *ultra vires* or that such guaranties were unenforceable for failure of consideration. The debtor's sole defense is that article XII, § 6 applies to corporate guaranties and in the absence of certain consideration renders the guaranties unenforceable.

The Bankruptcy Judge upheld the validity of the guaranties. The district court agreed, finding that article XII, § 6 was intended to limit a corporation's ability to incur capital indebtedness rather than other forms of liability such as guaranties.

II. Discussion

■ Whether corporate guaranties are "stocks or bonds" for purposes of article XII, § 6 depends in the first instance on the intentions of the authors of the Texas Constitution. Their purposes may best be inferred from the historical context and the particular set of problems to which they were responding.

In the Interpretive Commentary to the Constitution of 1876, article XII, § 6 is characterized as "a guaranty against the issue of what is known as 'watered stock'" that "was included in the Texas Constitution as an answer to the Credit Mobilier scandal." [2] *See* Texas.Const. art. XII, § 6 (Vernon).

After the Credit Mobilier scandal in 1872 and the Panic of 1873, when the failures of watered corporations carried thousands of stockholders to ruin, many southern states grew impatient with Congress's failure to enact laws governing corporate practices such as issuing watered stock. Some, such as Texas, decided to include in their constitutions provisions outlawing such practices.

Article XII § 6, represents an attempt by the state of Texas to protect its corporate creditors and stockholders against impairment of the capital structure of corporations. This provision removed from promoters and directors of corporations the absolute discretion to decide the consideration in exchange for which the corporation would issue debt or equity securities. Instead of the speculative promise of future services, money or property, as in the Credit Mobilier, article XII, § 6 requires that stock or bonds be issued only for "money paid, labor done or property actually received."

■ The appellees would interpret the word "bond" in § 6 to apply to all corporate indebtedness, rather than merely capital indebtedness, and would thus construe "stocks or bonds" to include corporate guaranties. This proposition is on the face of it, unpersuasive, and reflection favors it with little more plausibility.

■ Were "stock and bonds" construed to include all forms of corporate indebtedness, as the debtor contends then no Texas corporation could be held to an obligation undertaken in exchange for future benefits, and certainly no corporation could guaranty the loan of another for future consideration. It is unimportant in this case whether the debtor was to receive future consideration; in all likelihood it was not. The point remains that article XII, § 6 manifestly did not purport to limit the universe of a corporation's obligations to those incurred for money, labor or property actually received, but merely to preclude stock or bond issues

from the record. It is true, however, that Cohn Furniture's guaranties were duly authorized by its board of directors.

**2.** The Credit Mobilier scandal arose from transactions between the Union Pacific Line, which Congress had authorized to build a railway, and the Credit Mobilier, a construction company formed largely of Union Pacific stockhold-

ers. Although Congress had provided that shares of the railway company were to be sold at par, they were in fact sold to the Credit Mobilier at about one-third of their face value, in exchange for construction services at favorable rates. When in 1868 the Credit Mobilier issued dividends composed of watered Union stocks, so that for every $1,000 invested, $3,500 of stocks were allotted, the bubble burst.

for all other more speculative or contingent forms of consideration. After all, the evil expressly addressed by the statute is not primarily the absence of any corresponding benefit or even the absence of a proportionate benefit. It is, rather, the absence or incompleteness of present benefit. Money promised but not yet paid, work begun but not completed, property assigned but not yet received—these are insufficient to support a binding stock or bond issue under article XII, § 6. *See, e. g., Vermillion Parish Peat Co. v. Green Belt Peat Moss Co.,* 465 S.W.2d 950 (Tex.Civ.App.1971); *United Steel Industries, Inc. v. Manhart,* 405 S.W.2d 231 (Tex.Civ.App.1966). There is no reason, however, why future consideration is constitutionally inadequate to support other forms of corporate liability, such as ordinary trade debts, as the debtor would have us hold.

Accepting the debtor's argument would have another untoward result: it would entail the unconstitutionality of a Texas statute enacted to ensure the enforceability of certain corporate guaranties, Tex.Rev. Civ.Stat. art. 1302–2.06B (Supp.1975) (Vernon). That article, enacted in 1973 and therefore not directly controlling here, provides in part:

> Notwithstanding Section A of this Article, any corporation, domestic or foreign, doing business in this state shall have the power to make a guaranty respecting the contracts, securities, or other obligations of any person (including, but not limited to, any domestic or foreign corporation, partnership, association, joint venture, or trust, but excluding any officer or director of such guarantor corporation) if such guaranty may reasonably be expected to benefit, directly or indirectly, the guarantor corporation. The decision of the Board of Directors that the guaranty may reasonably be expected to benefit, directly or indirectly, the guarantor corporation shall be binding upon the

guarantor corporation, and no guaranty made by a corporation in accordance with the provisions of this Section B shall be invalid or unenforceable as against such corporation, unless such guaranty is sought to be enforced by a person who participated in a fraud on the guarantor corporation resulting in the making of the guaranty or by a person who had notice of such fraud before he acquired his rights under the guaranty.

Suppose that a corporate guaranty were subject to the constraints of article XII, § 6 of the Texas Constitution. Suppose further that a board of directors approved as consideration for a guaranty an assignment of royalties to operate in the future, reasonably expecting those royalties to accrue. The quoted statute would ensure the guaranty's validity and enforceability while the Texas Constitution would preclude the same guaranty from being enforced.

Moreover, there have been numerous Texas decisions upholding the validity of corporate guaranties for which money, labor or property had not been received. *See, e. g., Cooper Petroleum Co. v. LaGloria Oil & Gas Co.,* 423 S.W.2d 645 (Tex.Civ.App. 1967), *rev'd on other grounds* 436 S.W.2d 889 (Tex.1969) (agreement by corporation requesting guaranty to extend credit to corporation whose debt was being guaranteed was adequate consideration to uphold the validity of the guaranty); *Diamond Paint Co. of Houston v. Embry,* 525 S.W.2d 529 (Tex.Civ.App.1975). To be sure, we have found no case holding that corporate guaranties were outside the ambit of article XII, § 6; in no such case has the constitutional challenge been leveled.[3] On the other hand, the debtor cites no cases that stand for the proposition that corporate guaranties are within the ambit of article XII, § 6.

In the absence of controlling Texas authority, we think that both the trend of the caselaw and legislative policy militate

---

**3.** Even though the constitutional issue was not raised in these cases upholding corporate guaranties offered for consideration other than "money paid, labor done, or property actually received," the Texas courts could have reached the issue had such guaranties been thought unconstitutional.

against the debtor's construction of article XII, § 6. For example, in *Diamond Paint Co. of Houston v. Embry, supra,* 525 S.W.2d at 535, the court observed that although the 1973 amendment to article 1302–2.06 could not control that case, it was "indicative of the trend of public policy from 1963 to the present to increasingly sanction corporate guaranties and to ease restrictions against them."

We decide only that under the circumstances of this case, the corporate guaranties were neither "stocks" nor "bonds" for purposes of article XII, § 6. We can conceive of circumstances in which the claim that corporate guaranties fall within the scope of § 6 would be arguable, although we do not decide whether such claims would be successful. For example, a corporate guaranty might be used in tandem with an issue of stocks or bonds, in order to effect precisely that impairment of the capital structure of a corporation against which article XII, § 6 was directed. Suppose, for example, that a corporation takes full value for its stock but simultaneously guarantees the long-term debts of the purchasing shareholders for little or no consideration. The two transactions are linked; we may as well say that the corporation took less than full value for its stock. The long term effect of this scheme would be to weaken the capital structure of the firm. Although the inadequacy of the structure might be less palpable in this case than in the classic case of issuing watered stock, the essentials are the same. In the case at bar, however, there was no link between the guaranties and an issue of stock or bonds.

Now, ordinary debt characteristically differs from bonded indebtedness by virtue of the duration of the obligation, as well as the purposes and amount of the latter. It might be suggested therefore that a corporate guaranty of a long-term debt has characteristics that make it similar to a bond. Should the guarantor receive little or no benefit for the guaranty and subsequently become solely liable on the debt as a result of the insolvency of the original debtor, the indirect long term obligation has become a direct long-term obligation similar to a bond and unlike ordinary debt such as trade debts. Shareholders or creditors of the guarantor are in precisely the same position as they would be if the guarantor had taken little or no benefit from incurring a bond obligation. In the case at bar, however, it appears that the debtor guaranteed chiefly trade debts; in any event the debtor has presented no evidence on the record that it incurred long-term liability similar to a bond.

The debtor does not attempt to differentiate among varieties of corporate guaranties, however; indeed, it does not even differentiate among corporate liabilities. Rather, the debtor argues that all corporate liabilities in any form are subject to article XII, § 6.

We reject that argument and pretermit the question whether some corporate guaranties may come within article XII, § 6. Because the corporate guaranties in the case at bar were in no way tied to an issue of stocks or bonds of the debtor, and because the debtor has not shown that it incurred long-term indebtedness similar to a bond, we hold that article XII, § 6 of the Texas Constitution does not shield the debtor from the appellees' claims.

The guaranties here under examination do not remotely approach an article XII, § 6 interdiction. The judgment of the district court is

AFFIRMED.